UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

IN RE:

HEIDI A. STAFFORD AND TYSON J. STAFFORD,

      Debtors.
_____

HEIDI A. STAFFORD AND TYSON J. STAFFORD,

      Plaintiffs,

v.

NAVIENT SOLUTIONS, INC, PNC BANK, N.A. AND NATIONAL COLLEGIATE TRUST

      Defendants.

Case No. 13-19709

(Chapter: 7)

Adv, Pro. 14-01458

PLAINTIFFS' TRIAL BRIEF

COMES NOW Plaintiffs Heidi A. Stafford and Tyson J. Stafford ("Staffords"), by and through their attorneys, Henry, DeGraaff & McCormick, P.S., and files this trial brief in this matter. An order setting deadlines dated September 8, 2015 set forth deadlines to comply with for this trial set for November 6, 2015. The joint pre-trial order was filed October 30, 2015.

The issues before the court is whether the educational loans are dischargeable under 11 USC §523(a)(8).

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

# I.   FACTS

## A.    Background of the Defendants

Plaintiffs Tyson and Heidi Stafford, a married couple, attended high school together in Spokane, Wash. in the late 1990s. Both attended college briefly over the next few years, and by 2005 they were making ends meet by working in a number of low-wage jobs, including bartender and casino dealer. Seeking to improve their career prospects, they enrolled at Brooks Institute of Photography (now called simply "Brooks Institute") in Santa Barbara, Calif. in 2005 and began taking classes there that October.

## B.    A Bright Future Takes an Unexpected Turn

Brooks Institute of Photography was founded in 1945 by Ernest Brooks, Sr., an Army Air Force veteran, as a school where students were taught by specialists with an emphasis on hands-on experience and individual initiative.[1] During its first half-century, Brooks produced many alumni who went on to become award-winning photographers and filmmakers working prominently in the media and on well-known films and television programs.[2]

At the time the Staffords enrolled at Brooks, the future looked bright for professional photographers with skills and training. The Bureau of Labor Statistics reported that employment opportunities for photographers were expected to increase about as fast as the average for all occupations through 2012, predicting that increased demand for photographic images by new online publications would offset the reduced barriers of entry to the field caused by the onset of digital technology.[3] The Staffords hoped that by pursuing degrees at a prestigious institute like Brooks, they would be well positioned to provide for their futures at a profession they enjoyed.

---

[1] (Exhibit P-35 - *History of Brooks Institute*, http://www.brooks.edu/About-Brooks/History-Of-Brooks (last visited August 2, 2015)).

[2] (Exhibit P-36 - *Brooks Institute*, Wikipedia, https://en.wikipedia.org/wiki/Brooks_Institute (last visited August 2, 2015).

[3] (Exhibit P-37 - Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook, 2004-05 Edition*, Photographers, http://permanent.access.gpo.gov/lps4235/2004-05/2004-2005/ocos264.htm (last modified May 18, 2004)).

HENRY, DEGRAAFF & McCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

Unfortunately, the institute they attended turned out to be very different from the one Ernest Brooks had founded sixty years earlier. In 1999, Brooks had been purchased by Career Education Corporation, a for-profit operator of educational institutions.[4] Shortly after the Staffords enrolled, the California Bureau for Private Postsecondary and Vocational Education found that the school had "'willfully' provided misleading and falsified information and omitted other information that 'persuaded prospective students to enroll' in its educational programs." *Id.* A bureau employee who visited the school posing as a prospective student was told that she could expect her starting salary to be "$50,000 to $150,000" in her first year after graduation from Brooks.[5] (The Staffords had been told a similar story when they enrolled.) In fact, the bureau found, not one 2003 graduate was earning even $50,000 per year, and the average annual income of graduates was about $26,000, with an average indebtedness of $74,000. *Id.*

To finance their education, the Staffords took out student loans that were approved by Brooks as necessary to pay the costs of attendance, including tuition, room and board, books and supplies, fees and living expenses, from Sallie Mae (hereinafter "Navient") totaling $41,312 in subsidized federal Stafford loans, $52,830 in unsubsidized federal Stafford loans and $230,140 in alternative (private) loans. (Exhibit P-47).

| Enrollment | Cost of Attendance Per Student | Tuition and Fees | Net Sallie Mae Distribution to Student after Loan Fees |
|---|---|---|---|
| 10/28/2005 – 6/24/2006 | $37,200.00 | $16,240.00 | $14,799.01 |
| 7/14/2006 – 3/3/2007 | $37,001.00 | $16,240.00 | $15,520.00 |

---

[4] (Exhibit P-38 - Doug Lederman, *Calif. Reins In a For-Profit College*, InsideHigherEd, https://www.insidehighered.com/news/2005/07/20/brooks (July 20, 2005)).

[5] (Exhibit P-39 - Gretchen Morgenson, *The School That Skipped Ethics Class*, The New York Times, http://www.nytimes.com/2005/07/24/business/yourmoney/the-school-that-skipped-ethics-class.html (July 24, 2005)).

PLAINTIFFS' PRE-TRIAL BRIEF - 3

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105ᵀᴴ ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

| Enrollment | Cost of Attendance Per Student | Tuition and Fees | Net Sallie Mae Distribution to Student after Loan Fees |
|---|---|---|---|
| 3/9/2007 – 10/27/2007 | $37,506.00 | $16,640.00 | $16,340.00 |
| 11/2/2007 - 6/21/2008 | $39,391.52 | $17,840.00 | $16,240.00 |
| 7/11/2008 – 12/20/2008 | $29,597.02 | $13,380.00 | $12,180.00 |
| TOTAL[6] | $180,695.54 | $80,340.00 | $75,079.01 |

Navient distributed the loan money directly to the school, as per their usual practice, and the school distributed the funds that remained after tuition and fees to the Staffords for books, supplies, and living expenses. (P-47).

Digital technology would indeed revolutionize the photographic field while the Staffords attended Brooks, and the curriculum at the for-profit school failed to keep up. The Staffords received extensive training in film photography and film development techniques that are all but worthless in an era dominated by digital photography, while at the same time receiving almost no education in the digital photography and post-production practices that are commonly used today. Nevertheless, the Staffords worked hard and conscientiously to complete their degree programs, and both graduated in December 2008 with Bachelor of Arts degrees in professional photography.

Today, the photographic industry has changed in ways that were all but unimaginable in 2005. The ubiquity of smartphones with high-quality cameras that make it possible for amateurs to produce professional-quality images has led a number of media organizations to dispense with

---

[6] Pell grants and miscellaneous costs and fees account for the balance.

PLAINTIFFS' PRE-TRIAL BRIEF - 4

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

professional photographers altogether.[78] Today, the Bureau of Labor Statistics projects that employment for professional photographers will grow at just 4 percent from 2012 to 2022, compared to 7 percent for all arts, design, entertainment, sports, and media occupations, and 11 percent for all occupations.[9] Both Staffords have worked sporadically in photography since graduating into a deep recession in 2008, but have found their employment prospects to be much as the California Bureau for Private Postsecondary and Vocational Education characterized them three years earlier. Heidi Stafford has done some studio photography work, both as a freelancer and on her own, while Tyson spent time commuting between Seattle and Los Angeles for photography work from 2009 to 2011, and has worked occasionally as an assistant at a studio in Seattle. Today they primarily support their young son by working in the same low-wage occupations they pursued before their schooling—Heidi as a casino dealer, Tyson as a bartender—in between periods of unemployment.

## C.  The Staffords' Current Income and Expenses and Prospects for Future Earnings

The Staffords originally filed their bankruptcy as a Chapter 11 bankruptcy on October 31, 2013 with net household income on Schedule I of $4,599.60 and household expenses of $5,203.00. (P-43). At the time of filing, Heidi Stafford worked as a casino dealer at the Red Dragon Casino on Aurora Avenue in Seattle, Wash. after deciding to wind down her wedding photography business, which proved unprofitable. Initially, Heidi retained her studio space with a sublet, hoping to ultimately find a way to pursue her passion for photography while still working another job. Since that time she has cancelled the studio lease and closed down the

---

[7] (Exhibit P-40 - Amar Toor, *Chicago Sun-Times trains reporters to shoot with iPhones after laying off all its photographers*, The Verge, http://www.theverge.com/2013/6/1/4386074/chicago-sun-times-cuts-entire-photography-staff-trains-reporters-iphone (June 1, 2013)).

[8] (Exhibit P-41 - Kim Peterson, *Why Sports Illustrated laid off all of its photographers*, CBS News MoneyWatch, http://www.cbsnews.com/news/why-sports-illustrated-cut-all-of-its-photographers/ (January 26, 2015)).

[9] (Exhibit P-42 - Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook, 2014-15 Edition*, Photographers, http://www.bls.gov/ooh/media-and-communication/photographers.htm (published January 8, 2014)).

PLAINTIFFS' PRE-TRIAL BRIEF - 5

HENRY, DeGRAAFF & McCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

wedding business bank accounts to work at the casino full time. Tyson Stafford worked as a bartender in the Capitol Hill neighborhood of Seattle for the Lobby Bar, a popular bar where he had good tips and working shifts and pursued freelance photography gigs on the side.

On July 10, 2014, the Staffords converted their case to Chapter 7, realizing that they could not file a feasible Chapter 11 plan and that they would have to file an adversary proceeding to obtain a discharge of their student loans. (Exhibit P-44). Focusing on their jobs as a casino dealer and a bartender to the detriment of entrepreneurial photography pursuits netted greater income for their family, while allowing them to set their work schedules to take care of their young child without the need for expensive daycare. At the time of their conversion to chapter 7, their income had steadily improved until Tyson Stafford received a layoff notice shortly thereafter from his employer after the Lobby Bar lost its lease, leaving him unemployed for six months, only just finding employment in May 2015 with a new bar on Capitol Hill.

Today the Staffords' combined monthly gross income is $5,513.67 a month with deductions of $901.50 for taxes and L&I of $9.95 a month. (Pre-trial order, pg 6). Their young son has just started school and a flexible work schedule allows the Staffords to raise their child without the need for childcare expenses. While one or both of them could theoretically fill some of their remaining hours with additional part-time work, the need to pay for daycare would likely make it a losing proposition. As it is, with at least one parent at work from 9:30 am to 3 am some days, their work arrangements make it difficult for the Staffords to spend time together as a family. Nonetheless, Heidi Stafford is currently looking diligently for additional part-time work now that her son is old enough to be in school full-time, but those efforts may be short-lived as the Staffords recently found out that they are expecting a new baby in July 2016. (Pre-trial order pg 9, Exhibit P-56).

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

The Staffords currently reside in an apartment they lease in Capitol Hill in Seattle. (Pre-trial order pg 6). Their rental house is close to Tyson's job, which is convenient for a family with only one car and provides them with the stability of one parent working close to home to assist with emergencies and to provide childcare to their six year old child, Keene. Heidi Stafford works the day shift at the Red Dragon Casino and Tyson Stafford works the night shift at the Barca Lounge. (Pre-trial order page 6; Exhibits P-50, P-51, P-52). Housing in Seattle has increased at a rapid pace over the past few years, with the median rent in Seattle for a family of three at $2,045 per month. (Exhibit P-34)

Rent in downtown Seattle is generally also at a premium. The Staffords are not immune to this issue and have weighed the costs and benefits of moving to a suburban location. However, with the time for commute, the need for additional transportation costs with two commuting parents and the inevitable day care costs that would necessitate such a move, the Staffords have made a prudent decision to keep costs at bay and stay in their current house, the rent for which has just increased from $1700 a month to $1800 a month. (Exhibit P-31). The Staffords have been fortunate to find a suitable home at a below-market rental rate in which to raise their child. They make no representation that they would ever be able to afford to buy the home at its current market price, nor do they intend to try.

Heidi and Tyson Stafford purchase healthcare from the Washington State healthcare exchange. (Pre-trial order, pg 6; Exhibit P-53). Their current income qualifies them for a $63.00 tax credit for a bronze level health care plan with Group Health. Their current monthly premium is $377.24 a month and their 6 year old son is still covered by Washington State's Apple Health for Kids. However, when their income rises to more than 400% of the national poverty level, they will no longer qualify for a tax credit and their son will not qualify for Apple Health.

Additional monthly expenses show current expense totals of $4,511.13 and the actual expense

HENRY, DEGRAAFF & McCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

items are listed in the current income and expense budget for September 30, 2015. (Pre-trial order, pg 9; Exhibit P-10).

**D.     Efforts to Repay Student Loans**

The Staffords paid at least $6,546.07 on eleven student loans to Navient and they obtained between either six or seven forbearances on each loan. However, as of July 30, 2015, Tyson and Heidi's combined student loans owing total $546,429.43. (Exhibit D-14). With payments increasing rapidly due to interest rates as high as 13.12%, despite the Staffords doing everything they could to work with their lenders, once they went into default, the effort it took to even find all their loans that were in collection with several different debt collectors made it impossible to work out any long term payment arrangements after they went into repayment proved fruitless. To make the monthly loan payments, the Staffords would have to pay nearly $5,392.16 a month under the original loan term of twenty years. Navient holds eleven student loans with outstanding balances of over $546,429.43 as of July 30, 2015. (Pre-Trial Order pg 3 and admitted Exhibits P-2, P-3, P-46, P-48. P-49, D-2, D-3, D-4, D-5, D-6, D-7, D-8, D-9, D-10, D-11, D-12, D-13, D-14 and D-15).

| No. | Identifier | Proof of Claim # | Loan# (last four digits) | Outstanding Loan Balance | Total amount paid on loans | Interest Rate | Forbearance Requests | Monthly Payment for 20 years |
|---|---|---|---|---|---|---|---|---|
| 1 | Heidi Loan# 02 | #8 | 1562 | $102,083.84 | $680.39 | 13.12% | 7 forbearances requested | $1,204.72 |
| 2 | Heidi Loan# 06 | #9 | 1570 | $67,306.28 | $304.61 | 8.75% | 7 forbearances requested | $594.79 |
| 3 | Heidi Loan #09 | #10 | 1588 | $51,718.78 | $204.17 | 8.75% | 7 forbearances requested | $457.04 |
| 4 | Heidi Loan #12 | #11 | 1596 | $38,030.52 | $150.83 | 7.25% | 7 forbearances requested | $300.58 |
| 5 | Heidi Loan #15 | | 1604 | $20,782.82 | $189.98 | 10.00% | 7 forbearances requested | $200.55 |
| 6 | Tyson Loan #10 | #13 | 5001 | $51,382.80 | $62.66 | 8.75% | 6 forbearances requested | $495.85 |
| 7 | Tyson Loan # 13 | #15 | 5019 | $38,321.57 | $15.63 | 7.25% | 6 forbearances requested | $302.88 |

HENRY, DEGRAAFF & McCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8 | Tyson Loan # 16 | | 5027 | $18,978.09 | $1,759.04 | 10.00% | 6 forbearances requested | $183.14 |
| 9 | Heidi Loan #1 | | 9818 | $6,208.45 | $2,987.71 | 5.50% | 5 forbearances requested | $59.91 |
| 10 | Tyson Loan # 01 | #14 | 4988 | $85,302.88 | $116.86 | 13.12% | 6 forbearances requested | $1,006.68 |
| 11 | Tyson Loan # 07 | #12 | 4996 | $66,313.40 | $80.83 | 8.75% | 6 forbearances requested | $586.02 |
| | | | | **$546,429.43** | **$6,546.07** | **Monthly Payment** | | **$5,392.16** |

Since prior to the filing of this bankruptcy proceeding, Navient had accelerated and charged off all of the loans above, making them immediately due and payable. The Staffords are not eligible for any forbearances and deferments presently. Under the terms of the contract, there is no rehabilitation option or alternative payment program that the Staffords could enter into without the court's involvement. Payments are listed above solely for the court's discretion but do not exist under any contractual terms at this time.

### a. *Additional Student Loan Expenses - Federal Stafford Consolidation Loans*

The Staffords both have federal student loans that are owned by the Department of Education's William D. Ford Direct Loan Program and are serviced by Fed Loan Servicing and Nelnet. Tyson and Heidi Stafford have both entered into Income Based Repayment programs for their respective loans that are not part of this lawsuit but remain as a significant expense to their budget. They have recently updated their income criteria as required by the program a new 12 month payment plan for their respective loans which are as follows:

| **Borrower** | **Owner Name/ Sched Type** | **Total Repay Amount** | **Repay Term** | **Interest Rate** | **Install Amount** | **Dues Due Date** |
|---|---|---|---|---|---|---|
| Tyson Stafford | US Dept of Ed / IBR-PFH | $39,304.56 | 12 months 138 months | 6% | **$75.85** $278.22 | 10/21/2015 10/21/2016 |

PLAINTIFFS' PRE-TRIAL BRIEF - 9

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

| | | | | | | |
|---|---|---|---|---|---|---|
| Tyson Stafford | US Dept of Ed / IBR-PFH | $71,352.84 | 12 months 154 months | 6% | **$116.40** **$454.26** | 10/21/2015 10/21/2016 |
| Heidi Stafford | US Dept of Ed / IBR-PFH | $27,804.90 | | 6.25% | **$183.38** | |
| Heidi Stafford | US Dept of Ed / IBR-PFH | $46,393.75 | | 6.25% | | |
| | <u>**TOTAL**</u> | <u>**$184,856.05**</u> | | <u>**NEXT 12 MONTHS PAYMENT**</u> | <u>**$375.63**</u> | |

     *a.* ***Additional Student Loan Expenses - National Collegiate Student Loan Trust and PNC Bank***

The also Staffords entered into a settlement and obtained a judgment against Defendant National Collegiate Trust ("NCT") on September 2, 2015 discharging their student loan debt with NCT with the exception of $15,000.00, which will be paid in monthly installments of $62.50 a month for 240.00 at 0% interest. (Exhibit P-54) The remaining defendant, PNC Bank, NA, agreed to a judgment for a full discharge of its student loan debt on July 16, 2015 (Exhibit P-55).

## II.  LAW

**A.  Student Loans Are Excepted From Discharge Pursuant to 11 USC §523(A)(8)**

To prove that student loans are dischargeable under § 523(a)(8), a debtor has to affirmatively bring an adversary proceeding in bankruptcy to rebut the presumption of nondischargeability because student loans are not automatically discharged, even if they are not the kind of loan that requires an *undue hardship* analysis. Fed.R.Bankr.P 7001(4); 11 USC § 523(a)(8).

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

**1.     The Brunner Test**

The Ninth Circuit Court of Appeals has adopted the three-part test from *In re Brunner*, 46 B.R. 752 (S.D.N.Y.1985), *aff'd*, 831 F.2d 395 (2d Cir.1987), to determine whether excepting a student loan from discharge constitutes an undue burden on a debtor. *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108 (9th Cir.1998). Under the so called *Brunner* test, to obtain a discharge of a student loan obligation, the debtor bears the burden of proving, by a preponderance of the evidence, all of the following:

> 1) That the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loans;
>
> 2) That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
>
> 3) That the debtor has made good faith efforts to repay the loans.

*Brunner,* 46 B.R. at 754. The debtor bears the burden of persuasion as to each prong of the *Brunner* test. *Rifino v. United States (In re Rifino),* 245 F.3d 1083, 1087 (9th Cir. 2001)*; In re Carnduff,* 367 B.R. 120 (9th Cir. BAP 2007).

    **a.**   *Test 1: Minimal Standard of Living*

The first prong of the Brunner test requires that the debtor show that they cannot maintain, based on *current income and expenses*, a "minimal" standard of living if forced to repay the loans. *Brunner,* 831 F.2d at 396. To meet this requirement, the debtors must demonstrate more than simply tight finances. *Rifino*, 245 F.3d at 1088; *In re Nascimento,* 241 B.R. 440, 445 (9th Cir. BAP 1999). The Ninth Circuit clarified in *In re Mason,* 464 F.3d 878, 882, n. 3 (9th Cir. 2006) that the first prong of the Brunner test does not impose a requirement that a debtor maximize his income, only a minimal standard of living based on the debtor's current income and expenses. Rather, the proper inquiry is whether it would be "unconscionable"

PLAINTIFFS' PRE-TRIAL BRIEF - 11

HENRY, DeGRAAFF & McCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

to require the debtor to take steps to earn more income or reduce her expenses. *See In re*

*Nascimento,* 241 B.R. 440, 445 (9th Cir BAP 1999).

> i.    *Plaintiff's Terms of Employment*

Navient argues that the Staffords have not maximized their current income without

knowing the circumstances of the Staffords employment. In fact, the Staffords already exceed

the average annual wage for their occupations in King and Snohomish counties, making it

difficult for them to earn significantly more.[10] As is typical for their occupations, the jobs held by

the Staffords are structured to require them to work or be available to work close to full time

over four or five days per week. They work staggered hours that allow them to take care of their

six-year-old child without the need for any daycare expenses in their budget, but limit their

ability to spend time together during most of the week. Tyson works as a bartender, an

occupation that the Washington State Employment Security Department characterizes as "not in

demand" in King County.[11] He was laid off from the Lobby Bar in Seattle in November 2014

after working for five years full time, and after searching diligently for six months, took a job as

a bartender at the Barca Lounge in Seattle. As a new employee, Tyson works less desirable

afternoon and evening shifts from Sunday to Thursday for a total of about 30 hours a week, and

more recently he has been able to work an additional 5 to 6 hours on the more lucrative Friday or

Saturday evening shifts. Although he wants to work more hours, he is often sent home earlier

than his scheduled time off owing to fluctuating business at the lounge, especially on

weeknights. (Exhibit P-33).

---

[10] A bartender and a gaming dealer in the Seattle–Bellevue–Everett metropolitan division earned average annual wages of $29,071 and $28,386 in 2014, respectively. Washington State Employment Security Division, *2014 Occupational Employment and Wage Estimates*, 75, 79.

[11] Washington State Employment Security Division, *Learn about an occupation*, https://fortress.wa.gov/esd/employmentdata/reports-publications/occupational-reports/occupations-in-demand (enter "King County" and "Bartender" in the appropriate search fields).

PLAINTIFFS' PRE-TRIAL BRIEF - 12

HENRY, DeGRAAFF & McCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

Heidi is scheduled to work or be on call morning and afternoon hours on Tuesdays and Wednesday, even though her regular shifts on Thursday, Friday and Saturday are generally from 9:30 am to 8:00 pm or 9:00 pm, which means someone must be available to take their son to school and pick him up and watch him until she comes home from work. Like Tyson, Heidi is also often sent home early from her shifts when business is slow, which is often the case during spring and summer months. Where the evidence does not show that a modest increase in the Staffords' income would be adequate to fully amortize the entire amount of their student loan debt, failure to work more hours is no basis for failing the first prong of the *Brunner* Test. *In re Carnduff*, 67 BR 120, 128 (9th Cir BAP 2007).

ii. *Minimal Standard of Living: Expenses*

In determining whether undue hardship exists, the court considers the reasonableness or necessity of all expenses, including the amount spent on housing, the type of vehicle driven by the debtor and payment required for it, and personal expenses such as clothing and entertainment expenses. *In re Rifino*, 245 F.3d 1083, 1088 (9th Cir. 2001) (finding expenses for private school tuition, new car payments and expenses like tanning salons could be reasonable in light for the particular facts and circumstances of the debtor).

In making this fact-intensive determination, courts should consider a number of factors, including comparisons to expenses allowed under the IRS Collection Financial Standards ("Means Test"). *See In re Booth*, 410 BR 672, 676 (Bankr. E. D. WA 2009); *Means Testing: Census Bureau, IRS Data and Administrative Expenses Multipliers*, U.S. Trustee Program, http://www.justice.gov/ust/means-testing/means-testing-cases-filed-or-after-may-15-2015 (updated June 10, 2015). (Exhibit P-34). Using the Means Test expense guidelines for a family of three, the Staffords match up as follows.

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

| Line | Description | MEANS TEST Expenses for Three Persons | ACTUAL EXPENSES |
|------|-------------|---------------------------------------|-----------------|
| 19A | Food (includes meals at home or away) | $660.00 | $525.00 |
| 19A | Housekeeping supplies (includes laundry and cleaning supplies; other household products such as cleaning and toilet tissue, paper towels and napkins; lawn and garden supplies; postage and stationary; and other miscellaneous household supplies) | $65.00 | $48.00 |
| 19A | Apparel & services (includes shoes and clothing, laundry and dry cleaning, and shoe repair) | $209 | $117.00 |
| 19A | Personal care products & services (includes hair care products, haircuts and beautician services, oral hygiene products and articles, shaving needs, cosmetics, perfume, bath preparations, deodorants, feminine hygiene products, electric personal care appliances, personal care services, and repair of personal care appliances) | $64.00 | $50.00 |
| 19A | Miscellaneous | $251.00 | $235.00 |
| 20A | Rent (includes renter's insurance) | $2,024.00 | $1,832.00 |
| 20B | Non-Mortgage Expense (gas, electricity, water, heating oil, bottled gas, trash and garbage collection, wood and other fuels, septic cleaning, basic telephone and cell phone ) | $583.00 | $424.00 |
| 22A | Transportation Expense / vehicle operation (registrations, licenses, inspections, parking and tolls) | $192.00 | $154.00 |
| 23 & 24 | Ownership cost for Car (operating costs include maintenance, repairs, insurance, fuel,) | $517.00 | $524.00 |
| 27 | Life Insurance | Actual | $11.00 |
| 31 | Other Necessary Expenses: health care (unreimbursed deductibles medications therapy co-pays) | Actual | $113.00 |

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

| Line | Description | MEANS TEST Expenses for Three Persons | ACTUAL EXPENSES |
|---|---|---|---|
| 32 | Other Necessary Expenses: telecommunication services (Does not include basic phone or cell service. Pagers, call waiting, long distance, caller ID, and internet may be included, depending on amount and circumstance; test is whether "necessary for health and welfare or production of income." | Actual | $40.00 |
| 56 | Federal Student Loan Payments under IBR for Heidi Stafford | Actual | $183.38 |
| 56 | Federal Student Loan Payments under IBR for Tyson Stafford | Actual | $192.25 |
| 56 | NCT Student Loan Payment | Actual | $62.50 |
| | **TOTAL EXPENSES** | **$5,167.13** | **$4,511.13** |

Using the Means Test, the expenses for a family of three should be $5,299. The Staffords' overall expenses are $4,511.13, which are $656.00 a month below the Means Test expenses. To match expenses with the Means Test, the base amount of $40.00 was reduced from their cell phone bill for basic telephone services and $40.00 from their internet/cable bill for other necessary expenses for the health and welfare or production of income for the family. Any expenses for cell phone or cable in excess of those amounts are included in miscellaneous along with expenses for entertainment, child activities and other expenses. In the near future, their budget will be even tighter as they welcome a new baby to their family and incur the additional medical expenses associated with Heidi Stafford's pregnancy. (Exhibit P-56).

A minimal standard of living for a family with a school-age child can reasonably include internet access and expenses for recreation. *See in re Greenwood*, 349 B.R. 795 (Bankr.D.Ariz 2006)(the Court looked at the Greenwoods' overall expenses as almost $1,000 less than the amount allowed under the means test expenses and found that they met a minimal standard of

HENRY, DEGRAAFF & McCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

living for a family with school-age children even with some basic entertainment expenses). Under a minimal standard of living test, "people must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet." *In re McLaney*, 314 B.R. 228, 234 (Bankr. M.D. Ala 2004). A review of the Staffords' expenses indicates that the Staffords are not enjoying an extravagant lifestyle. They rarely eat out and most of their entertainment expenses are enjoyed close to their home, while still maintaining a minimal standard of living.

The Staffords' educational background makes it unlikely that they will be able to obtain employment that would enable them to significantly increase their income in the foreseeable future. Brooks is not a regionally accredited school,[12] which means that the Staffords' degrees are essentially worthless to employers outside the photographic field, and they cannot use them to enroll in postgraduate programs at accredited colleges or universities. With both the Staffords working full time to take care of their young child, restarting their post-high school academic careers from scratch is out of the question, especially in light of their debts. Thus, even if the court finds some of the Plaintiffs' expenses excessive, its unconscionable to think that the debtors could reduce expenses enough to afford additional student loan payments of $5,392.16 a month. *See Nascimento,* 241 B.R. at 445

**b.**  *Test 2: Likelihood That the Current State of Affairs Will Persist*

The second prong of the *Brunner* test requires a debtor to show that additional circumstances exist such that the current state of affairs will persist over the life of the loan repayment period. *In re Brunner*, 831 F.2d at 396. "Additional circumstances" exist where there

---

[12] Most well-known public and private non-profit colleges and universities are regionally accredited. Credits and degrees from nationally accredited schools like Brooks are usually not accepted for transfer or enrollment at regionally accredited schools.

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

are such "barriers" to the debtor's recovery that the court believes the debtor will lack the ability to repay for several years. *In re Birrane*, 287 B.R. 490 (9th Cir. BAP 2002). Along with an inability to pay in the present, the debtor must demonstrate a likely inability to pay in the future; the debtor need not demonstrate exceptional circumstances beyond that. *In re Nys*, 446 F.3d 938 (9th Cir. 2006). a "debtor does not have a separate burden to prove 'additional circumstances,' beyond the inability to pay presently or in the future." *In re Nys,* 446 F.3d at 945. Although income increases are presumed, the debtors may rebut the presumption that their income will increase to a point where they can make payments and maintain a minimal standard of living by introducing evidence. *Nys,* 446 F.3d at 946. The "payments" referred to means the payments that would be required if the student loan debt at issue is not discharged. *Carnduff*, 367 B.R. at 130.

As the Staffords have already maximized their present income, it is inarguable that they are unable to pay their student loans at present. The Court in *Biranne* found that a single debtor without children who only worked 25 hours a week, and only in the evenings, was "declining to obtain additional work" and could possibly support additional payments on her student loans with another job. *In re Birrane*, 287 B.R. 490, 500. Comparatively, both the Staffords work and raise a small child. One parent works days while the other works evenings to avoid the need for daycare.

To meet the second prong of the *Brunner* test, the Staffords must show that their inability to pay will likely persist throughout a substantial portion of their loans' repayment period. *Nys*, 446 F.3d at 947. There is no requirement that additional circumstances be "exceptional" in the sense that the debtor must prove a "serious illness, psychiatric problems, disability of a depend[e]nt, or something which makes the debtor's circumstances more compelling than that of an ordinary person in debt." *Nys*, 308 B.R. at 444 (internal quotation marks omitted); *See also*, *In re Mason*, 464 F. 3d 878 (9th Cir. 2006)(Court clarifying that the debtor does not have a separate

Henry, DeGraaff & McCormick, P.S
1833 N 105th St, Suite 203
Seattle, Washington 98104
telephone (206) 330-0595
fax (206) 400-7609

burden to prove "'additional circumstances,' beyond the inability to pay presently or in the future."); *In re Carnduff*, 362 BR 120, 129 (9th Cir BAP 2007) (holding that the issue is not whether Debtors' financial circumstances are likely to improve *at all* but whether Debtors can rebut the presumption that their income "will increase *to a point where [they] can make" payments* and maintain a minimal standard of living.") Undue hardship requires only a showing that the debtor will not be able to maintain a minimal standard of living now and in the future if forced to repay her student loans. *Carnduff,* 367 B.R. at 130. The repayment at issue means the payments on the loans that would be required if the student loan debt at issue is not discharged. *Id.*

As examples of such non-medical "conditions," the court in *Turetto* cited: 1) the debtor's failure to derive any economic value from his educational debts; 2) the debtor's overall lack of education and/or training; 3) the number and health of the debtor's dependents; 4) the debtor's lack of marketable skills; and 5) the debtor's age. *Turretto*, 255 B.R. 884, 889 (Bankr. N.D. Cal. 2000). Using this analysis, the court in *Turreto* found that even a physically healthy 35-year old woman nonetheless warranted a full discharge of her student loans because her certificate from Lawton Business School, despite being only three years old, was obsolete; her responsibilities as an office clerk (limited to answering phones and mail) provided her with no marketable skills; and consequently, it was highly unlikely she could find a higher-paying position. *Id.*

In a more recent decision from the western District of Washington, the court found that a 45 year old single woman with no dependents and no diagnosed medical conditions, making an adjusted gross income in 2010 of $47,159 met the factors under prong two of the *Brunner* test. *Educational Credit Management Corporation V. Kelly*, No. C11-1263RSL * 4-5 (W.D. Wash. Apr. 20, 2012) 6 (*overruled* on other grounds by *Kelly v. Sallie Mae, Inc.*, No. 12-35377 (9th Cir. Feb. 27, 2015)).

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

In *Kelly*, the debtor worked as an administrative assistant with the City of Seattle, which did not offer much opportunity for wage growth. *Kelly,* No. C11-1263RSL at * 4-5. Since her financial situation was likely to increase at the same low rate of growth throughout a substantial portion of the loan's repayment period, and taking into account her age, education and employment background, the court concluded that she would not be able to maintain a minimal standard of living now and in the future if forced to repay her student loans. *Id.*

As in *Turreto* and *Kelly,* the Staffords' background as photographers at an unaccredited regional school did not allow them to gain any marketable skills that will likely lead to any substantial increase in pay. *Turretto*, 255 B.R. at 889; *Kelly,* No. C11-1263RSL at * 4-5. While it is possible for the Staffords to find new work, in the current economy it is unlikely that their income will increase substantially without further education and marketable skills. *Turretto*, 255 B.R. at 889; *Kelly,* No. C11-1263RSL at * 4-5. What is certain is that they will never be able to use the education to obtain any significant increase in their income because of a lack of marketable skills. *See In re Nys*, 446 F.3d 938 (9th Cir.2006). The increased expenses of their young child over time is also likely to negate any potential increases in income. *In re Scott*, 417 Br 623, 631 (Bankr. W.D. Wash. 2009).

Here, even if the incomes for the Staffords increase over time and their expenses have only relatively small increases, they will never increase enough to pay their full student loan amount. Under their current loan amount due for both defendants, $546,429.43 at interest rates in up to 13.2%, the monthly payment would be $5,392.16 a month for the original loan term of twenty years. Additionally, if the Staffords do manage to obtain better employment in the photographic field or elsewhere, they have no hope of ever paying their student loan debt off. In fact, under present economic conditions and the terms of their outstanding loans, it is almost as unlikely that they will ever owe less than they do today, no matter how much they pay to their

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

creditors, if the debt is not discharged. The median pay for a full-time photographer in 2012, the most recent year for which the Bureau of Labor Statistics has data, was $28,490 per year. (Exhibit P-42). With the current balance on their loans totaling approximately $546,429.43 at interest rates of up to 13.2%, both Staffords could work as full-time photographers for the rest of their lives and pay *every cent* of their incomes to these creditors, and it would not even cover the interest assessed every year.[13] Since their education from Brooks Institute has provided few marketable skills outside photography, this is unlikely. *See Carnduff*, 367 B.R. at 130 (Exceptional circumstances were found where there was no way the Debtors could pay their student loan debts unless they won the lottery, received a substantial inheritance or found a gold mine or a treasure trove in the backyard, even though their earning capacity and financial circumstances should improve in the future, since their future income was unlikely to pay their *entire* student loan debt without undue hardship).

While the Staffords would like to work more hours at their current positions, under the law they are considered part-time employees, which means that their employers are not required to provide them with health insurance under the Affordable Care Act; as a result, they purchase subsidized insurance through the Washington Health Benefit Exchange since their current income is currently less than 400 percent above the poverty line.[14] If the Staffords' income

---

[13] Indeed, the terms under which Sallie Mae originally extended these loans to the Staffords were unsupportable even at the time the loans were established. While Brooks staffers were telling prospective students to expect salaries approaching $150,000 in their first years after graduation, the Bureau of Labor Statistics estimated the median annual earnings of salaried photographers to be $24,040, or about $2,000 per month. *Occupational Outlook Handbook, 2004-05 Edition, supra at n. 3.* After paying approximately $1,850 each to Sallie Mae each month per the terms of their loans, the fully employed Staffords would have been left with all of about $300 per month— $150 each—for rent, food, transportation, and other necessities. Sallie Mae knew or should have known that they were holding the Staffords to loan terms that they would never be able to meet *even if* they both found gainful employment in their field of study.

[14] *See King v Burwell*, ___ US ___, 123 S.Ct. 2480 (2015) ("… the Act seeks to make insurance more affordable by giving refundable tax credits to individuals with household incomes between 100 percent and 400 percent of the federal poverty line. §36B. Individuals who meet the Act's requirements may purchase insurance with the tax credits, which are provided in advance directly to the individual's insurer. 42 U. S. C. §§18081, 18082."

PLAINTIFFS' PRE-TRIAL BRIEF - 20

HENRY, DEGRAAFF & MCCORMICK, P.S<br>
1833 N 105TH ST, SUITE 203<br>
SEATTLE, WASHINGTON 98104<br>
telephone (206) 330-0595<br>
fax (206) 400-7609

increases, they will necessarily face increased expenses for health insurance, since their current healthcare subsidy is dependent on their low income. Likewise, their federal student loan payments are income-based with payments owed as a percentage of their gross income.[15] Additionally, the Staffords have a small child who will inevitably require additional expenses as he grows older.

A debtor need only establish by a preponderance of the evidence that the debtor's financial situation is not likely to improve. *Nys*, 308 BR at 442. Considering the inevitable increased expenses that will consume a significant portion of any increased income the Staffords receive, any such increase is unlikely to provide any significant additional income for student loan payments, and certainly not enough to make payments of $5,505.43 a month. *Id.*

     **c.**     *Test 3: Good Faith Effort to Repay*

The final requirement Staffords must prove to obtain a discharge on their student loans is that they must have acted in good faith in their "efforts to obtain employment, maximize income, and minimize expenses." *Hedlund v. Educational Resources Institute Inc.*, 718 F. 3d 848, 852 (9th Cir 2013). Courts will also consider a debtor's effort — or lack thereof — to negotiate a repayment plan and to make payments. *Hedlund*, 718 F.3d at 85. *See also Penn. Higher Educ. Assistance Agency v. Birrane*, 287 B.R. 490, 499-500 (9th Cir 2002). Additionally, even in situations where a debtor has made good faith payments before filing for bankruptcy, and investigated repayment alternatives yet still had her budget rise over the course of a Chapter 13 bankruptcy to include expenditures such as a car payment of $268 a month that will end in a less than three and rent of $900 a month which had increased $150 a month, the Ninth Circuit has

---

[15] *See In re Roth,* 490 BR 908, 913 (9th Cir BAP 2013). ("the IBRP requires the borrower to make a twenty-five year commitment to dedicate on a monthly basis 1/12th of fifteen percent of the amount her average gross income exceeds 150% of the federal poverty level for the debtor's family size. 34 C.F.R. § 685.221. The plan term would be twenty-five years; thereafter, any remaining balance would be forgiven. 34 C.F.R. § 685.221(f).")

PLAINTIFFS' PRE-TRIAL BRIEF - 21

HENRY, DeGRAAFF & McCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

found that the bankruptcy court has discretion to determine when the third prong of the *Brunner* test has been met under such circumstances. *Kelly,* No. C11-1263RSL at * 5-6 (*overruled* by *Kelly v. Sallie Mae, Inc.*, No. 12-35377 (9th Cir. Feb. 27, 2015)).

Here, the Staffords have made every effort to work with their creditors and to pay what they could. The record shows that the Staffords made payments and asked for forbearances from their lenders until their lenders would no longer work with them. Since graduation, the Staffords have been hit with the calamities of life like any other American, with periods of unemployment, job changes and loss of hope in their dreams to become photographers. They work as a casino dealer and a bartender, typical of the jobs that are available to people without marketable degrees in the 21st century. Like the debtor in *Kelly*, the Staffords are also faced with the increasing cost of living in Seattle, Wash, including a recent rent increase of $100.00 a month and the need for a reliable transportation in the form of a relatively new mini cooper that is the family's only form of transportation. *Kelly,* No. C11-1263RSL at * 5-6 (*overruled* by *Kelly v. Sallie Mae, Inc.*, No. 12-35377 (9th Cir. Feb. 27, 2015)). These expenses are not excessive and these and others are likely to increase over the remaining repayment period of their loans, while their wages are unlikely to see more than marginal increases. *Id.*

Navient emphasizes the Staffords' work schedule as the primary reason to deny the Staffords a discharge of their student loans. *See* Defendant's Response, at page 11, lines 24 - 27. However, this is not a situation where the debtors have *intentionally* minimized their income like other debtors who have failed to pass the good faith prong of the *Brunner* test. Unlike the debtors in *U.S. Dept. of Educ. v. Gerhardt (In re Gerhardt),* 348 F.3d 89 (5th Cir 2003), where the debtor obtained employment in the field of his degree but failed to pursue more lucrative opportunities, the Staffords left the photographic profession they trained for to work in the bar and casino industries, where each has earned more income.

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

Likewise, in *In re Birrane*, 287 B.R. 490, 494 (9th Cir. BAP 2002), the debtor was a single woman with no dependents who chose to work only 25 hours a week as a self-employed dance instructor, while donating her free time to her nonprofit and potentially successful dance studio instead of using it to make additional income. In contrast, Heidi Stafford closed her freelance photography business in 2014 after it proved unprofitable, and she remains willing and able to take work additional hours at work with her employer. Tyson is newly employed, and expects to add additional hours with better shifts as he grows in seniority. Since both of their employers employ early termination procedures for minimum wage hourly shifts when business is slow, they are not *voluntarily* working less hours than scheduled. Neither Heidi nor Tyson refuses to work additional hours, or work outside their chosen field of work when more lucrative opportunities arise. Their good faith should not be determined by work requirements that are beyond their control.

Lastly, there is no dispute that the Staffords made payments on their student loans to Navient making up approximately 1% of the debt owed, which is not an insignificant sum considering the amount of their loans and their current income. Despite the Staffords' efforts to pay their down their student loans, Navient tries to shift all responsibility for the amount of debt incurred away from itself and toward the Staffords, citing *In re Faish*, 72 F.3d 298, 305 (3rd Cir. 1995) (quoting In re Roberson, 999 F.2d 1132, 1137 (7th Cir. 1993) for the proposition that:

> Since "the decision of whether or not to borrow for a college education lies with the individual," it is "the student . . . [that] must accept the consequences of the decision to borrow."

However, the 9th Circuit BAP in *Carnduff*, 367 BR at 137, chided the lender (in that case, the US Government) that "the size of the debt cuts both ways" for the good faith prong of the *Brunner* test, and then quoted from the bankruptcy court's transcript in that case:

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON 98104
telephone (206) 330-0595
fax (206) 400-7609

In the first place, it is difficult to imagine, these two debtors receiving advanced degrees as a result of student loans in the amounts of hundreds of thousands of dollars and not wanting to pay anything for their education. On the Other hand, **it is incredible that the various lenders here would advance to these debtors student loans in the amounts they did and at the same time expect to get paid in full**. [emphasis added]

The moral hazard in student loans cuts both ways. If discharge is too easily obtained, borrowers are not incentivized to work to repay their loans. However, if discharge is too difficult, it incentivizes the *lenders* to make loans with no consideration toward the burden being placed on the borrowers or the likelihood that the borrowers can repay their loans. If Navient, as a result of the discharge of the Staffords' loans, is unable to make loans to similarly situated students at Brooks Institute of Photography, such students just might be saved from a similar fate.

**B.    Partial Discharge**

This court has already found that partial discharge is still the law in the Ninth Circuit and that the bankruptcy court has the power to determine whether a student loan is dischargeable through its equitable power under 11 USC § 105 regarding whether to limit the amount of student loan discharge after the factors of 11 USC § 523(a)(8) are met under in *Saxman v Educ. Credit Mgmt Corp*, 325 F.3d 1168 (9th Cir.2003) in the order denying Plaintiff's Summary Judgment on September 4, 2015, Docket# 67. The Plaintiff requests that the court's findings of fact and conclusions of law be incorporated into any ruling made in this case.

Since the Court has determined that it does possess the equitable power to grant a partial discharge, it is nevertheless not warranted in this case. As the Fourth Circuit in *Educational Credit Mgmt. Corp. v. Frushour (In re Frushour),* 433 F.3d 393,399-401 (4th Cir. 2005) has expressed, underlying the undue hardship requirement is a "heightened" requirement, that "protects the integrity of the student-loans program" and "prevent[s] debtors from easily discharging their debts at the expense of the taxpayers who made possible their educations." In this case, the Staffords have kept their federally backed student loans, and are only seeking the

HENRY, DeGRAAFF & McCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609

Court's assistance with private loans that carry no federal guarantee. No taxpayers will be harmed if these loans—established under predatory terms that were untenable even at the time they were made—are discharged. These creditors should not be allowed to use the bankruptcy code as a shield to protect them from the consequences of their irresponsible loan practices.

## III.   CONCLUSION

For all of the foregoing reasons, the Court concludes that the Staffords have rebutted the presumption of 11 USC §523(a)(8) that Defendant Navient Solutions, Inc's student loan debts are discharged.

Dated this 30th day of October, 2015

HENRY, DEGRAAFF & MCCORMICK, PS


By: /s/ Christina L Henry
Christina L. Henry, WSBA# 31273
Attorney for the Plaintiffs

HENRY, DEGRAAFF & MCCORMICK, P.S
1833 N 105TH ST, SUITE 203
SEATTLE, WASHINGTON  98104
telephone (206) 330-0595
fax (206) 400-7609